# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF FLORIDA
# TALLAHASSEE DIVISION

ARTHUR MAYO,

    Plaintiff,

v.                                CASE NO. 4:15cv610-RH/CAS

FLORIDA DEPARTMENT OF
TRANSPORTATION,

    Defendant.

_____/

## ORDER GRANTING SUMMARY JUDGMENT

     This is an employment-discrimination case. The plaintiff asserts he was disciplined and subjected to a hostile work environment in violation of Title VII and the Florida Civil Rights Act. The record shows though that the plaintiff was disciplined for a legitimate, nondiscriminatory, nonretaliatory reason. And the alleged mistreatment was not sufficiently severe or pervasive to sustain a hostile-work-environment claim. This order grants summary judgment for the defendant.

I

On a summary-judgment motion, disputes in the evidence must be resolved, and all reasonable inferences from the evidence must be drawn, in favor of the nonmoving party. The moving party must show that, when the facts are so viewed, the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

II

The plaintiff Arthur Mayo has worked for the defendant Florida Department of Transportation as a technician in the sign shop for over 30 years. He fabricates metal for road signs. The Department's sign shop is located in Lake City, and most of the employees there have worked together for at least 20 years. Mr. Mayo is one of only two African-American employees in the sign shop.

The sign shop is comprised of three different "crews," each responsible for a different step in the production of road signs. Each crew is led by a supervisor, called a "crew leader." The "metal" crew, on which Mr. Mayo works, is led by Joe Williams. Mr. Williams is African-American. The "silk screen" crew is led by John Reed, who is white. And the "handmade" crew is led by Mikel Graff, who is white. Randall Wainwright was the manager of the sign shop until he retired earlier this year. Mr. Wainwright is white.

Mr. Mayo says he began experiencing a hostile work environment in 2014. He says the source of the hostility was mostly Mr. Reed and Brett Russell, a sign-shop technician who is white.  Mr. Mayo has worked with Mr. Russell and Mr. Reed for over 20 years.  Mr. Mayo complained to Mr. Williams, Mr. Graff, and Mr. Wainwright—in that order—that his co-workers were picking on him and harassing him, but he says the mistreatment continued.  Mr. Mayo did not tell them he thought the reason for the mistreatment was his race.

On March 10, 2014, Mr. Russell was messing around with Mr. Mayo and taking pictures of him on a cell phone.  Mr. Mayo found Mr. Russell's actions to be harassing; he warned Mr. Russell that he would press charges if the antics continued.

On March 11, 2014, both Mr. Williams and Mr. Wainwright were out of the shop, so Mr. Mayo was supervised by Mr. Reed.  It was standard practice for one crew leader to fill in for another who is out.  Part of Mr. Reed's responsibility as Mr. Mayo's fill-in supervisor included signing off on Mr. Mayo's time slip. Technicians were responsible for logging the time they spent out of the shop each day (for lunch, breaks, and so forth) on a time slip, which was kept on a table near the front desk.  The process called for the technicians' crew leader to sign off on the time slip and present it to Jackie Nichols, the sign shop's administrator, who in turn submitted the technicians' work hours to the Department's management

system. When Mr. Wainwright was out of the shop, as he was on March 11, Ms. Nichols sat at the front desk and separately recorded the employees' arrival times on sticky notes.

Mr. Russell looked at Mr. Mayo's time slip, thought there may have been a discrepancy in the time Mr. Mayo recorded, and suggested Mr. Reed take a look at it. Mr. Russell was not responsible for reviewing time slips, and he did not look at anyone else's time slip that day.

Mr. Reed asked Ms. Nichols for her notes on Mr. Mayo's time for the day. Mr. Reed says he typically does this when he covers an employee who is not in his crew. Comparing Ms. Nichols's notes to Mr. Mayo's time slip, Mr. Reed discovered what he thought was a 15-minute discrepancy. Mr. Reed brought Mr. Mayo his time slip and asked him about the discrepancy. Mr. Mayo tore apart the time slip in front of Mr. Reed, apparently because Mr. Mayo did not agree with a change that Mr. Reed made.

Mr. Mayo knew Mr. Russell had mentioned something to Mr. Reed, so as Mr. Reed was retrieving a new time slip, Mr. Mayo approached Mr. Russell, who was sitting in a chair. Mr. Mayo crouched down in front of Mr. Russell, positioned his face about one foot away from Mr. Russell's face, and shouted profane language. The altercation lasted approximately fifteen seconds and was witnessed by other sign shop employees. Ms. Nichols could hear the shouting from her

location at the front desk and called for a supervisor; the altercation was over by the time a supervisor arrived.

That evening, Mr. Russell telephoned Dale Cook to report the incident. Mr. Cook worked in the Department's Office of Maintenance in Tallahassee and directly supervised Mr. Wainwright, albeit from a distance. Mr. Russell told Mr. Cook that Mr. Mayo head-butted Mr. Russell in the shop. Mr. Cook relayed the incident to his supervisor, Tim Lattner, by telephone. Mr. Lattner was the Director of the Department's Office of Maintenance and, like Mr. Cook, worked in Tallahassee. Mr. Lattner thought the allegations were fairly serious since they included complaints of physical contact. The Department has a zero-tolerance policy for violence in the workplace, and such conduct can result in termination. For these reasons, Mr. Lattner directed Mr. Cook to contact the Office of the Inspector General for an independent investigation.

The Inspector General's office conducted a thorough investigation into the matter, interviewing nine witnesses and collecting written witness statements. The investigator detailed his findings and conclusions in a report issued on May 6, 2014. The report found two allegations proved: (1) Mr. Mayo "displayed verbally and physically abusive and harassing behavior toward Mr. Russell and other coworkers during an altercation in a department facility," and (2) Mr. Mayo "demonstrated insubordination by destroying a time slip presented to him by John

Reed who was duly delegated as his supervisor." ECF No. 20-10 at 2. The report did not sustain the allegation that Mr. Mayo head-butted Mr. Russell.

Based on the findings of the independent Inspector General report, Mr. Lattner decided to suspend Mr. Mayo. Mr. Cook participated in the decision-making process, but Mr. Lattner was the ultimate decision-maker. The Department issued Mr. Mayo a letter on June 3, 2014, notifying him of the Department's intent to suspend him without pay for one week and his right to a predetermination conference.

On June 24, 2014, Thomas O'Connell, a Department manager based out of Orlando who did not know any of the sign-shop employees, conducted a predetermination conference relating to Mr. Mayo's proposed discipline. Mr. Mayo and Mr. O'Connell were the only two present at the conference, which lasted approximately 20 to 30 minutes. Mr. Mayo told Mr. O'Connell that he felt the proposed discipline was unfair and that he had reported "harassment" to his supervisors in the past. Mr. O'Connell ultimately recommended that Mr. Lattner stick with the proposed discipline—suspension. Mr. Lattner followed through.

On July 2, 2014, the Department issued Mr. Mayo a letter notifying him that he would be suspended from work without pay for the week of July 14. Mr. Mayo attempted to appeal his suspension with the Public Employees Relationship

Commission, but the appeal was dismissed as abandoned when he failed to show up for his hearing.

Following the suspension, Mr. Mayo recalls two occasions in which Mr. Reed and Mr. Russell made a racially derogatory comment about Mr. Mayo being late to work. On another occasion, Mr. Russell asked Mr. Mayo if he thought he was white for showing up to work on time.

On July 18, 2014, Mr. Mayo filed a charge of discrimination with the Equal Employment Opportunity Commission alleging discrimination, retaliation, and hostile work environment. He filed this lawsuit, initially in state court, in November 2015, alleging race discrimination and retaliation. Mr. Mayo testified that the hostility ceased toward the end of 2015 when the Department was "made aware of a claim being filed." Mayo dep., ECF No. 22-1 at 65-66.

III

When, as here, an employee relies on circumstantial evidence in support of a discrimination or retaliation claim, the employee may proceed under the familiar burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later cases. Under that framework, an employee first must present a prima facie case. The employer then must proffer a legitimate, nondiscriminatory, nonretaliatory reason for its decision. The employee then must show that the proffered reason was not the real reason for the decision and that

instead a reason was discrimination or retaliation.  Alternatively, the employee may present other evidence from which a reasonable factfinder could infer prohibited discrimination or retaliation.  *See, e.g., Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).

The standards that govern the claims under the Florida Civil Rights Act are the same as those that govern the federal claims.

IV

For Mr. Mayo's suspension, the issue expressed more generally is whether the Department's proffered legitimate reason for suspending Mr. Mayo was the true reason or was instead a pretext for race discrimination or retaliation.  The Eleventh Circuit has said that on this issue, the employee must meet the employer's proffered reason head on; disagreeing with the wisdom of the decision will not do.  The Eleventh Circuit has put it this way:

> A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason.

*Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000).  Mr. Mayo's burden here is to meet this standard.  He has not done so.

An independent investigation found that Mr. Mayo was insubordinate by tearing up the time slip, and that he displayed abusive and harassing behavior

toward his coworkers when he got in Mr. Russell's face and shouted profane language.  A reasonable director could, and this director did, suspend an employee on these findings.  Mr. Mayo did what he was charged with in the investigator's report.  He says he never head-butted Mr. Russell, but the report's findings were not based on that allegation.  The report specifically determined the head-butt allegation could not be sustained.  In other words, the head-butt allegation made no difference on the outcome.

Mr. Mayo has not identified a similarly situated employee who engaged in similar conduct but was not disciplined.  And three long-term sign-shop employees testified that there has never been anything in the sign shop similar to the incident that occurred between Mr. Mayo and Mr. Russell.

There is no evidence of any derogatory or discriminatory comments attributed to anyone who was involved in the decision-making process.  The decision to suspend Mr. Mayo was ultimately made by Mr. Lattner.  Mr. Cook participated in the decision-making process in some capacity, and Mr. O'Connell held the pre-determination conference.  None of these individuals even worked in the same city as Mr. Mayo, let alone the same building.  There is no evidence that Mr. Mayo ever complained of race discrimination to any of these individuals.  And Mr. Mayo's subjective belief that the decision was based on his race or in

retaliation for complaining about his coworkers, *see, e.g.*, Mayo dep., ECF No. 22-1 at 51, does not create a triable issue.

V

Mr. Mayo also alleges he was subjected to a hostile work environment. An employee asserting a hostile-environment claim must allege mistreatment "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002) (*quoting Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)). The mistreatment alleged here does not rise to this level. *Cf. id.* at 1276 (denying summary judgment on a hostile-environment claim where there was evidence that the plaintiff's coworker "hurled . . . ethnic slurs at [the plaintiff] three to four times a day").

Most of Mr. Mayo's allegations of mistreatment are attributed to Mr. Russell, but Mr. Mayo himself said the issues with Mr. Russell did not prevent him from doing his job. *See* Mayo dep., ECF No. 22-1 at 70-71. And while there is some evidence in the record of racial epithets being used in the workplace, that evidence is attributed to statements made between 10 and 40 years ago. The epithets and racially oriented comments were inexcusable, but they were not sufficiently severe or pervasive to establish an actionable hostile environment.

Further, the Department has raised a valid defense under *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 765. The Department has a policy that prohibits discrimination and that provides a process for making internal complaints of discrimination. Mr. Mayo did not follow this process. Instead, he waited until after his suspension to file an external complaint with the EEOC. No severe or pervasive activity occurred after the complaint.

VI

In sum, the record establishes without dispute that Mr. Mayo was suspended for a legitimate, nondiscriminatory, nonretaliatory reason: an independent investigation found he was insubordinate and displayed abusive and harassing behavior toward his coworkers. And the mistreatment Mr. Mayo experienced was not sufficiently severe or pervasive to sustain a claim under Title VII or the Florida Civil Rights Act. The Department is entitled to summary judgment.

VII

For these reasons,

IT IS ORDERED:

1. The defendant's summary-judgment motion, ECF No. 20, is granted.

2. The clerk must enter judgment stating, "This action was resolved on a motion for summary judgment. It is ordered that the plaintiff Arthur Mayo recover nothing on his claims against the defendant Florida Department of Transportation. The claims are dismissed on the merits."

3. The clerk must close the file.

SO ORDERED on August 29, 2016.

                                               s/Robert L. Hinkle
                                               United States District Judge